**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHEROKEE NATION,                      )
P.O. Box 948                          )
Tahlequah, OK 74465,                  )
                                      )
                    Plaintiff,        )          Case No.: _____
                                      )
        v.                            )
                                      )
KATHLEEN SEBELIUS,                    )
Secretary of the U.S. Dep't of Health )
    and Human Services                )
200 Independence Avenue, S.W.         )
Washington, D.C. 20201,               )
                                      )
        and                           )
                                      )
YVETTE ROUBIDEAUX,                    )
Director of the U.S. Indian Health Service )
801 Thompson Avenue, TMP 450          )
Rockville, MD 20852,                  )
                                      )
                    Defendants.       )
_____ )

**COMPLAINT**

The Cherokee Nation (Nation) complains and alleges as follows:

**I.  INTRODUCTION**

1.      This action is a follow-on case to Cherokee Nation v. Leavitt, 543 U.S. 631

(2005), Salazar v. Ramah Navajo Chapter, 567 U.S. __, 132 S. Ct. 2181 (2012), and Arctic Slope

Native Ass'n, v. Sebelius, 133 S. Ct. 22 (2012), on remand Arctic Slope Native Ass'n, v.

Sebelius, 501 Fed. Appx. 957 (Fed. Cir. 2012) (Arctic Slope II).  It involves the failure of the

federal government, acting through the Secretary of the U.S. Department of Health and Human

Services (HHS or Secretary) and the Director of the Indian Health Service (IHS or Director), to

pay in full various "contract support costs" (CSCs) to which the Cherokee Nation was entitled by

operation of law and by contracts entered into pursuant to the Indian Self-Determination and
Education Assistance Act (ISDA), 25 U.S.C. §§ 450–458ddd-2.

2.       In each instance alleged below, the Secretary failed to pay the Nation's full
contract support cost requirements based upon the Secretary's assertion that appropriated funds
were not legally available to make such payments in full.  In <u>Ramah Navajo</u> and <u>Arctic Slope II</u>,
the Supreme Court and the Federal Circuit rejected assertions by the Secretary of the Interior and
the Secretary of HHS, respectively, in connection with identical underpayments made to other
contracting Tribes.  132 S. Ct. at 2186; 501 Fed. Appx. at 959.  Both courts held the Secretaries'
failure to pay was a breach of contract.  <u>See</u> 132 S. Ct. at 2090-91; 501 Fed. Appx. at 959.

3.       The claims covered by this Complaint assert that in Fiscal Year (FY) 2011 and
FY 2012, the Secretary breached her contracts by failing to pay in full the contract support costs
which the Secretary acknowledged were due and owing to the Cherokee Nation under the
Nation's contracts.  The Nation seeks as damages the unpaid funds which the Secretary should
have paid, and would have paid at the time had there been no breach, and the associated lost
third-party collections which the Nation would have collected had each year's unpaid contract
support costs been fully paid.  These are the sums necessary to put the Nation back in the
position it would have been in had the Secretary not breached her obligations under the ISDA
and the Nation's contracts.

## II.  JURISDICTION

4.       This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1331, 1362;
25 U.S.C. §§ 450m-1(a), (d) of the ISDA; and 41 U.S.C. §§ 7103–7107 of the Contract Disputes
Act (CDA).

### III.  PARTIES

5.     The Cherokee Nation is a federally-recognized Indian Tribe with its tribal headquarters in Tahlequah, Oklahoma.  The Cherokee Nation is a "Tribe" as that term is defined by the Indian Self-Determination Act at 25 U.S.C. § 450b(e).

6.     Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services.  Secretary Sebelius exercises delegated responsibilities from Congress pursuant to the ISDA and other applicable law.  Dr. Yvette Roubideaux is the Director of the Indian Health Service.  Director Roubideaux exercises authority delegated to her by the Secretary to carry out the Secretary's responsibilities under the ISDA and other applicable law.  As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "HHS," "Director" and "IHS" are used interchangeably.

### IV.  FACTS AND GENERAL ALLEGATIONS

#### A.  The Contract Documents.

7.     Since 1993, the Cherokee Nation has operated various federal health care programs, functions, services, and activities of the Indian Health Service within the IHS Claremore Service Unit pursuant to contracts between the IHS and the Cherokee Nation.  From October 1, 1993 to the present, the Cherokee Nation has operated federal IHS programs pursuant to Compact No. 604G9340002 with the Indian Health Service, as initially authorized under Title III of the ISDA.  The tribally-operated federal IHS programs have expanded since the Nation originally entered the Compact and now cover eight health centers and clinics and one hospital and associated IHS programs, functions, services, and activities.

8.     Over time, the Cherokee Nation significantly expanded its provision of health care services. For example, in 2008, the Nation took over operation of the IHS W.W. Hastings Hospital and, in 2009, it expanded its contract to operate the IHS Three Rivers Health Center. As a result of these expansions, the Nation assumed responsibility for providing more of the health services that IHS had previously provided and thus was eligible for more of IHS's funding.

9.     This Compact has been amended and restated numerous times since 1993, most recently in 2005. See 2005 Compact. The Compact is the basic contract document at issue in this case. The terms of the Compact are required by and inextricably intertwined with the ISDA. The Compact is "authorized by Title V of the [ISDA] . . . [and] by signing this Compact the [Director of IHS] commits the Secretary to the extent and within the scope of the Secretary's delegation of authority to enter into Compacts and Funding Agreements pursuant to Title V or as otherwise authorized." Compact, Art. 1, § 1.1. Consistent with this authorization, the Compact relies heavily on the provisions of the ISDA.

10.     According to the Nation's Compact, the core purpose of the Compact was to:

> enabl[e] the Cherokee Nation to plan, conduct, consolidate, re-design and administer programs, services, functions, and activities of the Indian Health Service under the terms set forth in the Compact as provided in Title V of the Act; to reallocate funding for such programs, services, functions, and activities according to the priorities of the Nation, and to streamline the Federal IHS bureaucracy in accordance with 25 U.S.C. § 458aaa-4 and 458aaa-5.

Compact, Art. I, § 1.2.2. Title V provides that "[e]ach provision of this part and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 458aaa-11(f).

11.     The contract documents also include the Nation's Funding Agreements (FAs), which can cover single or multiple year periods.  See generally 25 U.S.C. § 458aaa-4(e) ("[E]ach funding agreement shall remain in full force and effect until a subsequent funding agreement is executed.").  The Nation operated under the same FA from FY 2009 through FY 2012.  Further, the FAs are often amended throughout the year to take account of new funds available to the Nation.  The Nation's FAs were governed by and incorporated into the Compact.  See Compact, Art. VI, § 6.2.

12.     The contract documents that are controlling for the FY 2011 and FY 2012 claims asserted here are the Compact, the FA in effect for those years, modifications to those documents, and other statutory and administrative provisions incorporated by law into such contract documents (including provisions of the ISDA).

## B.  The Contract Price.

13.     The contractual obligation of the Nation was to administer certain health care programs and provide certain health care services and functions previously provided by IHS. The contractual obligation of IHS, in return, was to make certain specified payments to the Nation; in other words, to pay the contract price.

14.     During the fiscal years at issue here, the Nation's contracts were authorized by Title V of the ISDA, 25 U.S.C. §§ 458aaa-458aaa-18.  Section 508(c) of the ISDA, 25 U.S.C. § 458aaa-7(c), requires that "[t]he Secretary shall provide funds under a funding agreement under this part in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this subchapter, including amounts for direct program costs specified under section 450j-1(a)(1) of this title and amounts for contract support

costs specified under section 450j-1(a)(2), (3), (5), and (6) . . . ."  Thus, at all relevant times, 25 U.S.C. §§ 450j-1(a)(2), (3), and (5) and related funding provisions of Title I of the ISDA, controlled the Secretary's funding obligations under the contracts.  These are the same provisions that the Supreme Court construed in <u>Cherokee Nation</u> and <u>Ramah</u>, and that the Federal Circuit construed in <u>Arctic Slope II</u>.

15.     The first referenced section, section 450j-1(a)(1), provides for the direct program funding, also called the "Secretarial amount," representing "the amount the Secretary would have expended had the government itself [continued to] run the program."  <u>Arctic Slope Native Ass'n, v. Sebelius</u>, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), <u>vacated on other grounds</u> 133 S. Ct. 22 (2012).  The FAs determined a contract price for the Secretarial amount prior to commencement of the contract.  The Secretarial amount was subject to being increased or decreased during the contract year to the extent the appropriation supporting the contracted program increased or decreased.  This would be done by a mid-year contract modification.  Many of the Cherokee Nation's contracts had mid-year amendments and modifications of this kind throughout the life of the contracts.

16.     In addition to paying the "Secretarial amount," the ISDA and FAs also require that the IHS pay contract support costs.  Section 450j-1(a)(2) provides that "[t]here shall be added to the amount required by paragraph (1) [i.e. to the Secretarial amount required by § 450j-1(a)(1)] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ."  25 U.S.C. § 450j-1(a)(2).

17.     These contract support costs are mostly "administrative expenses."  Cherokee v. Leavitt, 543 U.S. at 634.  Contract support costs fall into two main categories: indirect contract support costs, "such as special auditing or other financial management costs," id. at 635 (citing § 450j-1(a)(3)(A)(ii)), and direct contract support costs, "such as workers' compensation insurance" for certain annually recurring costs attributable directly to the personnel and facilities employed or used to carry out the federal IHS programs being contracted under the ISDA, id. (citing § 450j-1(a)(3)(A)(i)).  Contract support costs also include non-recurring one-time "startup costs," id. (citing § 450j-1(a)(5)).

### C.  The Calculation of Contract Support Costs.

18.     During the fiscal years at issue here, IHS calculated and paid contract support costs pursuant to, first, an IHS Circular and, later, the IHS Manual (collectively IHS Manual or IHM).  The IHS Manual explains how CSC requirements are to be determined.  IHS calculated the contract support cost requirement associated with the Cherokee Nation's FY 2011 and FY 2012 contracts pursuant to the IHS Manual.

19.     Pursuant to the IHS Manual, IHS "determine[s]" a contractor's "contract support cost requirement" prior to contract award.  See IHM § 6-3.1E(5).  IHS does this by calculating the contractor's indirect contract support costs and direct contract support costs; by reviewing those costs against the Secretarial amount to eliminate any duplicative costs; and by then setting the net amount as the contractor's "contract support cost requirement."  This is how IHS calculated the Nation's contract support cost requirement in each of the years at issue here.  This, then, is the amount for contract support costs which IHS is obligated to pay under the contract,

and is the amount IHS would have paid each year had the agency believed it had sufficient appropriations each year to make such payment.

*i. Indirect contract support costs.*

20.     Indirect contract support costs are the bulk of the contract support costs.  The IHS Manual instructs how indirect contract support cost requirements will be determined in any given year.  See IHM § 6-3.2E.   The Nation's indirect contract support cost requirements were determined pursuant to the IHS Manual in connection with the Nation's FY 2011 and FY 2012 contracts.

21.     Generally, indirect contract support costs are determined by a reference to a tribal contractor's "indirect cost rate."  25 U.S.C. § 450b(g).  As the Secretary correctly told the Court in Cherokee,

> [m]ost contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe."
> Brief for Federal Parties 7; see 25 U.S.C. §§ 450b(f)–(g).

543 U.S. at 635.  This is how IHS calculated the Nation's indirect contract support costs here.

22.     The Manual instructs IHS to determine the contractor's contract support cost requirement "by applying the negotiated [indirect cost] rate(s) to the appropriate direct cost base . . . ."  IHM § 6-3.2E(1).  In so doing, IHS uses the contractor's most recent indirect cost rate so long as it is not "more than three-years old."  Id.   IHS multiplies the contractor's most recent indirect cost rate against the direct cost base paid under the contract (i.e., the Secretarial amount less appropriate exclusions) to calculate the amount due for indirect contract support costs.  The direct cost base also includes all direct contract support costs.  See IHM § 6-3.4E(1) ("The DCSC, along with other Section 106(a)(1) funds, will be considered part of the recurring base of

the award."); IHM § 6-3.3A(3) ("[CSC] funding is based on the total amount associated with the [programs, functions, services, and activities] awarded from the date of assumption through the end of the FA performance period, not to exceed 12 months.").  If, as was the case here, the contractor has contracted to operate Area or Headquarters "tribal shares," an adjustment is made to reflect that 20% of such tribal shares are not to be included in the direct cost base and are instead to be considered a credit against the indirect contract support cost requirement.  IHM § 6-3.2F(2).  This is how IHS calculated the Nation's indirect contract support costs here.

23.     In broad terms, the rate used to calculate indirect contract support costs is determined by comparing the contractor's overall administrative or overhead costs for all of a contractor's functions (the indirect cost pool) as a percentage of the total money spent by the contractor for all of the programs it operates (the direct cost base).

24.     Tribal contractors primarily use two different types of indirect cost rates: either a "provisional-final" rate or a "fixed with carry forward" rate.  For each year at issue here, the Nation had a "fixed with carry forward" rate.  A "fixed with carry forward rate" is "fixed" in advance for a given year and remains "fixed" for that contract year—in other words, it is a predetermined rate which does not change and which generates a fixed contract price for the year.  The rate is calculated by the contractor's "cognizant agency," see Office of Management and Budget (OMB) Cir. A-87, § B.6, which for the Nation was the Interior Department, acting through the National Business Center (NBC).  For the contract years at issue here, NBC set the Nation's fixed indirect cost rate as follows:

| Year | Nation's Fixed with Carry Forward Rate |
|------|----------------------------------------|
| 2011 | 13.73% |
| 2012 | 14.15% |

If a subsequent audit of a contract year showed that the rate for that year should have been higher (or lower), i.e., that it did not accurately compensate the Nation for its actual indirect costs incurred for the year, a compensating adjustment would be made to a *future* year's rate, but the original fixed rate itself remained unchanged for the contract year to which it applied.[1]

25.     The product of applying the agency's indirect cost rate to the direct cost base is the contractor's indirect contract support cost requirement. This is the process IHS used to calculate the Cherokee Nation's indirect contract support cost requirement in FY 2011 and FY 2012.

*ii.     Direct contract support costs.*

26.     The IHS Manual also instructs how <u>direct contract support cost</u> requirements will be determined in any given year. The Cherokee Nation's direct contract support cost requirements were determined pursuant to the IHS Manual in connection with the Nation's FY 2011 and FY 2012 contracts.

27.     The IHS Manual instructs that direct contract support costs are negotiated according to detailed guidelines set forth in the Manual and an Appendix. IHM § 6-3.2D; IHM Exhibit 6-3-H. Once negotiated, direct contract support costs are paid on a "recurring basis"

---

[1]  OMB Cir. A-87, Attachment E, § B.6 ("'Fixed rate' means an indirect cost rate which has the same characteristics as a predetermined rate, except that the difference between the estimated costs and the actual, allowable costs of the period covered by the rate is carried forward as an adjustment to the rate computation of a subsequent period."); <u>see also</u> Dep't of Justice, Office of Justice Programs 2011 Financial Guide, Glossary of Terms, <u>available at</u> http://www.ojp.usdoj.gov/financialguide/Appendices/glossary.htm ("Fixed Rate with Carry Forward Provision is similar to a predetermined rate in that a permanent rate is established for a specific future period (usually one fiscal year) based on an estimate of the costs for that period. However, fixed rates also require an adjustment to actual costs once actual costs have been determined. The difference between the estimated costs used to establish the fixed rate and the actual costs of the fiscal year covered by the rate is 'carry forward' [sic] as an adjustment to the next rate negotiation.").

(IHM §§ 6-3.2D, 6-3.2D(2)), meaning they "do not require annual rejustification to the Secretary . . . ."  IHM § 6-3.1E(12).  See also IHM § 6-3.3B(2) ("As stated in paragraph 6-3.2D, DCSC funding is provided on a recurring basis."); IHM § 6-3.4E(1) ("The amount of the DCSC is provided to the awardee on a recurring basis and will not be reduced, but the amount may be renegotiated annually at the option of the awardee.").  Once negotiated, direct contract support costs are increased "by the amount needed to increase prior year DCSC funding by the national OMB non-medical inflation rate . . . ."  IHM § 6-3.3B(2).

28.     The IHS Manual provides a final step in connection with the determination of a Tribe's contract support cost requirement, concerning duplicative costs.  In this last step, all costs are reviewed for duplication to verify that the determined contract support costs do not duplicate contract funds being paid to a contracting Tribe as part of the Secretarial amount.  IHM § 6-3.2B. At the conclusion of this process, "*[t]his adjusted CSC requirement is the Section 106(a)(2) amount that the awardee is eligible to receive*, subject to available appropriations."  Id. (emphasis added).  This "adjusted CSC requirement" is the contract price for the contract support costs to be paid by IHS to a contracting Tribe.

### D.     Other Terms of the Contracts.

29.     The Cherokee Nation's contracts, together with the ISDA provisions incorporated into the contracts by operation of law, required that the Nation be paid no less than the full amount of the Nation's contract support cost requirement as determined under the IHS Manual.

#### i.   *The timing of payments and earned interest*.

30.     The contract price is to be determined at the beginning of the contract year.  The ISDA provides that "[*u*]*pon the approval of a self-determination contract*, the Secretary shall add

to the contract the full amount of funds to which the contractor is entitled under subsection (a) of this section . . . ."  25 U.S.C. § 450j-1(g) (citing § 450j-1(a)) (emphasis added); <u>see also</u> 25 U.S.C. § 458aaa-7(a) (authorizing "annual transfer of funding to be made at the beginning of a fiscal year").  Subsection (a), in turn, provides that the "contract price" consists of the two amounts—the Secretarial amount and the contract support costs—that "shall be added" to the contract.  Necessarily, both of these amounts would be determined and fixed "[u]pon the approval of a self-determination contract."  In the event of additional payments, the FAs provided that "[u]pon enactment of relevant appropriation acts or other law affecting availability of funds to the IHS, the amounts of funding provided to the Nation in this Funding Agreement shall be adjusted as necessary, and the Nation has been notified of such action, subject to any rights which the Nation may have under this Funding Agreement, the Compact, or the law." <u>E.g.</u>, FA § 4.10.1.

31.     Although the contract price is to be set at the commencement of the contract year, the statute permits the parties to choose whether the contract payments are to be made on an annual, semi-annual or quarterly basis.  The Nation and IHS here agreed in the FAs for the payment to be made in a single lump sum annual payment at the beginning of the contract year. Compact Art. IV, Art. III, § 3.3.1; FA § 5.1 (Generally, "payment to the Nation [is] to be made as follows:  One annual payment in lump sum to be made in advance. . . .").  Thus, under the express terms of the contracts, full payment to the Nation was due at the commencement of the contract year.

32.     The Nation's Compact and the statute both provide that funds paid to the Nation could earn interest, and that any such interest income could be used by the Nation for the

provision of additional services and would not diminish the amount due to the Nation.  See Compact Art. III, § 3.3.2 ("The Cherokee Nation shall be permitted to retain interest earned on funds paid under a Funding Agreement.  Interest earned on such payments  shall not diminish the amount of funds the Cherokee Nation is authorized to receive under its Funding Agreement in the year earned or in any subsequent fiscal year."); 25 U.S.C. §458aaa-7(h) ("An Indian tribe is entitled to retain interest earned on any funds paid under a compact or funding agreement to carry out governmental or health purposes and such interest shall not diminish the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the interest is earned or in any subsequent fiscal year.")

*ii.  The right to collect third-party program income*.

33.     When IHS operates a health facility, it is generally authorized to bill and collect payments from Medicare, Medicaid and private insurers for services provided to covered patients.  Such collections generate funds supplemental to funds appropriated to IHS.  See 25 U.S.C. §§ 1621e, 1645; 42 U.S.C. §§ 1395qq, 1396j.  This is because an IHS health program is a "payer of last resort."  25 U.S.C. § 1623(b) ("Health programs operated by the Indian Health Service, Indian tribes, tribal organizations, and Urban Indian organizations . . . shall be the payer of last resort for services provided by such Service, tribes, or organizations to individuals eligible for services through such programs, notwithstanding any Federal, State, or local law to the contrary.")

34.     The FA with the Nation also provided that IHS would transfer to the Nation all reimbursements received from such third-party billing and collection.  Section 4.7.1 of the FA provides that "The IHS shall transfer to the Nation all reimbursements . . . from Medicare,

Medicaid, other third-parties and the Catastrophic Health Emergency Fund ("CHEF") arising from care provided or funds expended by the Nation and from care provided by the IHS at the Hastings Hospital.  The transfer of Medicaid, Medicare and other third-party reimbursements shall be made by IHS to the Nation as the funds are received by IHS."  Thus, under the contracts, the Nation was entitled to supplemental revenues that would be generated by billings to and payments by federal, state and private insurers.

35.     Pursuant to the authorities noted above, the Nation collected revenues from Medicare, Medicaid and private insurers for services rendered to covered beneficiaries of those programs.  The Nation's annual audits for all of the subject years were regularly provided to IHS and they set forth the Nation's collections from Medicare, Medicaid and private insurance plans.

*iii.   The right to spend, reallocate or rebudget funds.*

36.     The Nation's Compact authorized the Nation, to "plan, conduct, consolidate, re-design and administer programs, services, functions, and activities of the [IHS] under the terms set forth in the Compact as provided in Title V of the Act; [and] to reallocate funds for such programs, services, functions, and activities according to the priorities of the Nation. . . ." Compact, Art. I, § 1.2.2.  Further, the Compact provided that "the Nation may redesign or consolidate  programs, services, functions, and activities (or portions thereof) . . . and reallocate or redirect funds for such programs, services, functions, and activities (or portions thereof) in any manner that the Nation deems to be in the best interest of the health and welfare of the Indian community being served, only if the redesign or consolidation does not have the effect of denying eligibility for services to population groups otherwise eligible to be served under applicable Federal law."  Compact Art. IV, § 4.5; see also FA§ 2 ("This Funding Agreement

14

further authorizes the Nation to consolidate and redesign PSFAs as provided in the Act, and [applicable sections] of the Compact."). Similarly, the ISDA provides that the Nation may "reallocate or redirect funds for such [contracted] programs, services, functions, and activities (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served . . . ." 25 U.S.C. § 458aaa-5(e).

37.     Funds paid under the Compact were not required to be spent in the year for which they were paid. See Compact, Art. IV, § 4.8 ("All funds paid to the Nation in accordance with this Compact or associated Funding Agreements shall remain available until expended. In the event the Nation elects to carry over funding from one year to the next, such carryover shall not diminish the amount of funds the Nation is authorized to receive under its Funding Agreement in that or any subsequent fiscal year."). The related ISDA provision similarly states that "[a]ll funds paid to an Indian tribe in accordance with a compact or funding agreement shall remain available until expended. In the event that an Indian tribe elects to carry over funding from 1 year to the next, such carryover shall not diminish the amount of funds the Indian tribe is authorized to receive under its funding agreement in that or any subsequent fiscal year." 25 U.S.C. § 458aaa-7(i).

*iv. Interpretation.*

38.     In interpreting the IHS's obligations, the Supreme Court has said that "[c]ontracts made under ISDA specify that '[e]ach provision of the [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .'" 25 U.S.C. § 450*l*(c) (model agreement §1(a)(2)). Ramah, 132 S. Ct. at 2191; see also 25 U.S.C. § 458aaa-11(f) (similar Title V provision). The Supreme Court has interpreted this language to mean that the

15

Government "must demonstrate that its reading [of the ISDA] is clearly required by the statutory language." <u>Ramah</u>, 132 S. Ct. at 1291.  <u>See also</u> Compact, Art. V, § 5.14 ("Except as otherwise provided by law, the Secretary shall interpret all Federal laws, Executive orders, and regulations in a manner that will facilitate the inclusion of programs, services, functions, and activities (or portions thereof) and funds associated therewith, into this Compact and the associated Funding Agreements; the implementation of this Compact and the associated Funding Agreements; and achievement of the Nation's health goals and objectives, in accordance with 25 U.S.C. § 458aaa-11(a). ").

### E.  The Claims Presented.

39.    The Nation's FY 2011 and FY 2012 claims are based on the contract documents—the Compact, Funding Agreement, Indirect Cost Rate Agreement and others—that are part of the Record.

40.    The Cherokee Nation's contracts required that the Nation be paid no less than the full amount of the Nation's contract support cost requirement as determined under the IHS Manual, subject only to the availability of appropriations.  Under <u>Cherokee</u>, <u>Ramah</u>, and <u>Arctic Slope II</u>, appropriations during 2011 and FY 2012 were legally available to pay the Nation's contract support cost requirement in full.

41.    During fiscal years 2011 and 2012, the Secretary failed to pay the full amount of the Cherokee Nation's contract support cost requirement.  The Secretary's failure was contrary to the Nation's statutory and contractual rights as set forth by the Supreme Court in <u>Cherokee</u> and <u>Ramah</u>, and as further specified in the Nation's contracts with IHS and in the ISDA.  <u>See</u> 25 U.S.C. §§ 450j-1(a)(2), 450j-1(a)(3), 450j-1(a)(5), 450j-1(b), 450j-1(d)(2), 450j-1(g).

42.     On August 3, 2012, the Nation presented claim letters to the IHS for breach of contract claims for FY 2011 and FY 2012.  The letters claimed damages from the Secretary's breach of the duty to pay the Nation the full amount of contract support cost requirement calculated pursuant to IHS's policies, including amounts for the indirect contract support cost shortfall, the direct contract support cost shortfall, indirect contract support cost shortfall on the unpaid direct contract support cost amount, and the lost third-party revenue damages.  The Nation sought "without limitation, all damages arising out of IHS's failure to pay full contract support costs as required by the ISDA and Cherokee's contracts."

43.     The IHS failed to render a decision on these claims.  In the face of this failure, the Cherokee Nation deemed the contracting officer's inaction to be a denial of all claims (41 U.S.C. § 7103(f)(5)).  The Cherokee Nation timely appeals to this Court from this denial.

### F.     IHS Shortfall Reports.

44.     The Secretary has conceded that the Nation did not receive full payment of the contract support costs due to the Nation in each covered year, because the Secretary contemporaneously documented the underpayment each year.  The ISDA requires IHS to report to Congress each year on the agency's calculation of the contract support costs that are due, and what it actually paid against what was due.  25 U.S.C. § 450j-1(c); see also IHM § 6-3.5B (requirement to prepare annual reports).  Because IHS has chronically underpaid the amounts due to tribal contractors, Congress mandated that the annual report also include "an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted . . . ."  25 U.S.C. § 450j-1(c)(2).  These reports accordingly have become known as the "IHS Contract Support Cost Shortfall Reports."

45.     These Reports show the math which IHS employed to calculate the Nation's indirect contract support cost requirement, including the "Direct Cost Base" (or "program base"); the Nation's "IDC [indirect cost] Rate;" and the resulting "IDC [indirect cost] Need." E.g. Fiscal Year 2007 IHS Contract Support Cost Shortfall Report, Oklahoma Area, cols. N, O, Q.  (Each Report was prepared a few months after the close of each fiscal year, so that the "2007 Report" actually details the data for fiscal year 2006, and so forth).  The Reports also show the inflation-adjusted amount of direct contract support costs due.  Id., col. I ("DCSC [Direct Contract Support Cost] Negotiated Need").

46.     The Reports were prepared after an opportunity for consultation with the Cherokee Nation (IHM § 6-3.5B(1)); they were certified by the Oklahoma Area Office as accurate (IHM § 6-3.5B(1)); and they were approved by the IHS Director (IHM § 6-3.5B(3)).

47.     The IHS Shortfall Reports understate the actual amount of the shortfall owed to the Nation.  For instance, they do not take account of the fact that IHS owes additional indirect contract support costs on any portion of the direct contract support cost requirement that was not actually paid to the Nation.  The Reports also fail to take account of the third-party revenue damages owed to the Nation as a direct consequence of the Secretary's breach of contract.  Thus, the amounts set forth in the annual Shortfall Reports are the minimum additional amounts IHS would have paid the Cherokee Nation had IHS each year fully paid all of the Nation's contract support cost requirements.

48.     Nonetheless, the Shortfall Reports constitute binding party admissions by the Secretary of the minimum additional contract support cost amounts owed by the Secretary to the

Cherokee Nation.   The IHS is estopped from denying the accuracy, admissibility and completeness of these congressionally-mandated Shortfall Reports.

## V.  FIRST CAUSE OF ACTION
### (Breach of Contract Shortfall Claim)

49.     The Cherokee Nation incorporates all previous allegations of fact and law into this Cause of Action.

50.     The Cherokee Nation's contracts required the Secretary to fully fund the Nation's contract support cost needs.  In doing so, the contracts incorporated the statutory provisions of the ISDA requiring full payment of contract support costs.  In the Cherokee, Ramah and Arctic Slope decisions, the Supreme Court and the Federal Circuit affirmed the Government's duty to fully pay these contracts in the years at issue here.

51.     Despite the Government's duty to pay the Nation the full contract price of the Nation's FY 2011 and FY 2012 contracts, the Secretary failed to do so.  This failure was recorded in the Shortfall Reports, compiled by the agency and signed by the Secretary, certifying the amount of underpayment every year.  In failing to pay the Nation the full contract price of its contracts, the Government breached its contracts with the Cherokee Nation.

52.     General contract principles control the calculation of damages in government contract litigation.  This is so because "'[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'"  Winstar v. United States, 518 U.S. 839, 895 (1996) (quoting Lynch v. United States, 292 U.S. 571, 579 (1934)).  See also Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 607–08 (2000) (quoting Winstar and relying on the RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT")); Franconia Assocs. v. United

States, 536 U.S. 129, 141 (2002) (quoting Mobil Oil and applying principles of general contract law).

53.     General contract law on the issue of damages is clear:  a contractor is entitled to damages which will protect "his 'expectation interest,' which is his interest in having the benefit of his bargain *by being put in as good a position as he would have been in had the contract been performed . . . .*"  RESTATEMENT § 344(a) (emphasis added).

54.     In order to fulfill the Nation's "expectation interest" arising from the Secretary's breach of contract for failing to pay the contract amount owed, the Nation is entitled to three categories of damages, as set forth below.

### A.  Damages for Underpayment of Direct and Indirect Contract Support Costs.

55.     During FY 2011 and FY 2012, the Secretary failed to meet her statutory and contractual obligations to the Nation by failing to pay the Nation's full contract support cost requirement, as recorded in the Shortfall Reports.  The Secretary's annual failure to pay the Nation the full contract support cost requirement constitutes for each year a separate breach of statutory and contractual rights.

56.     The Nation's contracts with the Secretary were fixed-price contracts.  Each year the Secretarial amount was negotiated and fixed, the direct contract support cost amount was negotiated and fixed, and the indirect cost amount was based on a "fixed" rate.  None of these amounts was made payable on a "reimbursement" basis, none was dependent upon receipt of invoices or vouchers, and none was refundable to the Secretary.  All the indirect and direct contact support cost sums identified by the Secretary in her CSC Shortfall Reports in connection with the Nation's contracts would have been paid in full to the Nation but for the Secretary's

conclusion that appropriations were unavailable to make those payments. Thus, the Government is liable to the Nation for the unpaid amount of the Nation's full direct and indirect contract support cost requirements, together with accrued interest and attorneys' fees and costs, as specifically prayed below.

**B. Damages for Failure to Pay Indirect Contract Support Costs on Direct Costs Owed.**

57. Contract support costs are made up of direct costs and indirect costs. Direct contract support costs, comprising expenses directly attributable to a certain program or activity, are, by definition, not added to the indirect cost pool. Instead, these costs are part of the direct cost base. IHM § 6-3.4E(1) ("The DCSC, along with other Section 106(a)(1) funds, will be considered part of the recurring base of the award."). As part of the direct cost base, these direct costs are eligible for indirect contract support costs. In administering these direct costs, the Nation incurs costs which, under the IHS Manual, are to be included in its indirect contract support costs. See id.

58. The failure of the IHS to fully fund the Nation's direct contract support costs resulted in a corresponding shortfall in the Nation's indirect contract support cost payments, over and above the shortfall in indirect contract support costs recorded in the Shortfall Reports. To make the Nation whole, IHS is required to pay not only the underfunded amount of direct contract support costs but also an amount equal to this underfunded amount multiplied by the Nation's indirect cost rate.

**C. The Damages for Lost Third-Party Revenues.**

59. Expectancy damages for breach of the Secretary's contracts with the Nation are measured by the amounts required to place the Nation in the position it would have been in had

there not been a breach.  Thus, "an award of damages will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because *only by awarding lost profits will the plaintiff be made fully whole*."  WILLISTON ON CONTRACTS § 64:2 (4th ed.) (emphasis added); see also RESTATEMENT § 347(b) (recoverable damages may include "incidental or consequential loss, caused by the breach").

60.     In order to recover damages in the form of lost profits, a contractor must establish three elements by a preponderance of the evidence:  foreseeability, causation and reasonable certainty; in other words that (1) the lost profits were actually foreseen by the breaching party at the time of contracting (or else were reasonably foreseeable by that party); (2) the Government's breach caused the contractor's loss; and (3) the amount of the loss can be established with reasonable certainty.  Anchor Sav. Bank, FSB, v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010); see also Bluebonnet Sav. Bank, FSB, v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citing RESTATEMENT §§ 347, 351, 352).

61.     The Nation's receipt of collections from Medicare, Medicaid and private insurance plans for services provided by the Nation was both an integral part of each contract, see Compact, Art. IV, § 4.7 and FA § 4.7.1, and was actually foreseeable.  Indeed, the Government uses the prospect of these third-party revenues as a means of encouraging Tribes to enter into self-governance contracts.  See OFFICE OF TRIBAL SELF-GOVERNMENT, INDIAN HEALTH SERVICE, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, THE INDIAN HEALTH SERVICE TRIBAL SELF-GOVERNANCE PROGRAM, available at http://www.ihs.gov/selfgovernance/ documents/zcard.pdf.  These collections from Medicare, Medicaid, and private insurance were also included in IHS's Budget Justifications for FY 2011 and FY 2012.  See, e.g., INDIAN

HEALTH SERV., DEP'T OF HEALTH & HUMAN SERVS., JUSTIFICATION OF ESTIMATES FOR APPROPRIATIONS COMMITTEES CJ-137 (2012), available at http://www.ihs.gov/BudgetFormulation/index.cfm?module=dsp_bf_congressional ("Public and private collections are a significant part of the IHS and Tribal budgets, and provide increased access to quality health care services for American Indian and Alaska Natives[.]"); see also id. at CJ-11—CJ-12, CJ-49, CJ-62—CJ-63, CJ 137—CJ-139 (other references to inclusion of Medicare, Medicaid, and private insurance collections in IHS program funding).

62.     At all relevant times the Government was well aware that the failure to pay full contract support costs to the Nation would result in reduced services and thus reduced collections from third-party payers.  Since at least 1987, the federal government has been aware that when Tribes face contract support cost shortfalls, they are forced to use program money to cover the shortfall, which "results in decreased amounts of funds for services," see S. REP. NO. 100-274 at 12 (1987), and that reduced program services meant there would be less billing to and collections from third-party payers.  It was thus reasonably foreseeable that, if IHS underpaid the Nation the amounts due under the Nation's contracts for contract support costs, the Nation would receive fewer collections from third-party payers.

63.     The Government's breach caused the Nation to lose third-party collections. Because of the Government's failure to fully fund the Nation's contract support costs, the Nation was required to divert program funds to pay for the shortfall in contract support cost payments. This resulted in a reduction of program services that the Nation could provide, and a consequent reduction in billings to third-party payers.  Thus, but for the Government's breach in failing to

pay full contract support costs, the Nation would have provided additional medical program services for which the Nation would have collected additional revenues.

64.     The Nation's damages for lost third-party collections are provable to a reasonable certainty based on the actual yearly rate of return on the services it did provide under its contracts.    The Nation's income from Medicare, Medicaid and private insurance plans is regularly reported in the Nation's audits.   From those audits one can readily calculate the ratio that actual collections bore to IHS contract payments in each year.   This actual historical rate of return provides a reasonable basis for calculating the Nation's damages for lost third-party collections.   See Ramah Navajo School Board v. Sebelius, No. 6:07-cv-00289 at 62 (D.N.M. May 9, 2013) (finding that calculating third-party revenues based on a collection rate to be "a reasonable and satisfactory methodology" and on that basis awarding damages to an ISDA contractor).

65.     The record here shows that (1) the Nation's lost collections from Medicare, Medicaid and private insurance plans were reasonably foreseeable by the Secretary; (2) the Secretary's breach by failing to pay in full the contract price caused these losses; and (3) the amount of the losses can be established with reasonable certainty by reference to the Nation's audits.   The Nation is therefore entitled to recover additional damages against the Secretary to compensate for these losses in third-party revenues.

66.    The Government is liable to the Nation in damages for the amounts required to place the Nation back in the position it would have been in had there been no breach of the Secretary's duty to pay the Nation's contract support costs in full, including not only the unpaid contract support costs but also the associated lost third-party collections.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Cherokee Nation prays that this Court grant the following relief:

(a)     A declaratory judgment (i) that the Secretary acted in violation of the ISDA by failing to pay the Cherokee Nation the full amount of contract support costs that the Nation was due under its contracts with the Secretary, as properly calculated, and (ii) that the Secretary breached her contracts with the Nation by failing to pay the full contract support cost requirement, as properly calculated, that was due to the Nation in FY 2011 and FY 2012; and

(b)     A money judgment for the amount due to the Cherokee Nation as a result of the Secretary's breach of contract in FY 2011 and FY 2012, including damages for underpayment of contract support costs, for miscalculation of contract support costs and for loss of third-party revenues that the Nation would have received had the contract not been breached by IHS; and

(c)     Interest for one year from the payment due date for each payment the Secretary failed to make under each contract, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907; and

(d)     Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109, from the date of each claim until the date of payment upon entry of final judgment; and

(e)     Costs and attorneys' fees incurred in pursuing this claim, including the appeal before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; 25 U.S.C. § 450m-1(c) and other applicable law; and

(f)     Such other monetary, declaratory and equitable relief as this Court may find to be just.

///

///

///

///

///

///

///

Respectfully submitted this 8th day of October 2013.

SONOSKY, CHAMBERS, SACHSE
MILLER & MUNSON, LLP

*/s/ Lloyd B. Miller*

By: _____

Lloyd B. Miller
D.C. Bar No. 317131
AK Bar No. 7906040
Donald J. Simon
D.C. Bar No. 256388

900 West Fifth Avenue, Suite 700
Anchorage, AK  99501
Telephone: (907) 258-6377
Facsimile: (907) 272-8332
E-mail: Lloyd@sonosky.net